UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARY E. WATERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2355 (RCL) |
| | ) | |
| UNITED STATES ATTORNEY GENERAL, ALBERTO GONZALES | ) ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the Court for a bench trial on January 24-25, 2005. The Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. Plaintiff, Mary E. Waters, has worked for the Department of Justice since 1980, and in the Environmental and Natural Resources Division ("ENRD"), Enforcement Section, since 1984. (Tr. 7.) She is an African American. (Tr. 7.) Since 1987 she has been a paralegal at grade GS-11. (Tr. 8; Pl. Exh. 1.)

2. In ENRD, a paralegal must be promoted to Supervisory Paralegal to achieve grade GS-12. (Tr. 8.)

3. Plaintiff applied for the position of Supervisory Paralegal in August of 2000 in response to Vacancy Announcement ENRD-00-0038. (Pl. Exh. 1.) Plaintiff was not selected for

1

the position.  Julia Bunnell, a Caucasian woman, was selected instead.  (Def. Exh 8; Tr. 294-95).

4. Ms. Bunnell had worked with the ENRD at the Department of Justice since 1993 and has been a paralegal at Grade GS-11 since 1997.  (Pl. Exh. 2.)

5. Both plaintiff and Ms. Bunnell had filled in as a Supervisory Paralegal as needed, had previous experience as supervisors in past jobs, had received awards, and had sufficient tenure within the ENRD and the Department of Justice.  Both had paralegal certificates; however plaintiff had completed a Master's program in management at National Louis University in McLean, VA while Ms. Bunnell did not have a bachelor's degree. (Pl. Exh. 1; Pl. Exh. 2.)

6. Five applicants, including plaintiff and Ms. Bunnell, were certified by human resources personnel as qualified applicants for the position advertised in Vacancy Announcement ENRD-00-0038. and each was thereby worthy of consideration by the recommending officials . (Def. Exh. 8; Tr. 67-68).  To be certified, an applicant needed to, among other things, possess the requisite knowledge, skills, and abilities ("KSA"s) listed in the Vacancy Announcement.  (Tr. 169; see Def. Exh. 2.)  The five KSAs were supervisory skills, legal research skills, knowledge of the Federal Rule of Evidence, knowledge of environmental statutes, and oral communication ability.  (Def. Exh. 2.)  Human resources personnel ranked each of the five applicants in the five required KSAs.  (Tr. 171.)  Ms. Bunnell scored 21.  Plaintiff scored 19.  (Def. Exh. 6.)  Human resource's KSA ratings were only for the purpose of certification and were not passed along to the recommending officials .  The recommending officials  were not aware of the KSAs or the scores.  (Tr.

302-03.)

7. The recommending officials indicated that due to the nature of the Supervisory Paralegal position, people skills and the ability to take on any needed task were as important as the paralegal skills listed in the ranking factors. (Tr. 92-93, 96-97, 302-03.) The Supervisory Personnel Specialist agreed these were important factors to consider in the interview process. (Tr. 188.) A candidate's education could be considered, but no particular level of education was required for the Supervisory Paralegal position. (Tr. 172-73.)

8. Plaintiff, with her promotion application, submitted her performance appraisal for the period of April 1, 1997 through March 31, 1998. Plaintiff received an overall rating of "excellent," the second highest of five possible ratings. Plaintiff received a rating of "excellent" in three of the five component job elements and a rating of "fully successful," the middle of the five possible ratings, in the two other elements. (Pl. Exh. 1). Though plaintiff has filed grievances over other performance appraisals, plaintiff did not grieve the 1997-1998 appraisal. Plaintiff's performance appraisal for the following year, April 1, 1998 through March 31, 1999, had lower ratings: overall, plaintiff's performance was rated at "fully successful;" (Def. Exh. 7; Tr. 36.), however, the recommending official never learned of this later evaluation until after he considered plaintiff's application, (Tr. 84-85). Never has plaintiff received an outstanding rating on any of her ENRD performance evaluations. (Tr. 29-30.)

9. Ms. Bunnell, with her promotion application, submitted her performance evaluation, which was for the period of April 1, 1999 through March 31, 2000. Ms. Bunnell received an overall rating of "outstanding," the highest possible rating. She received a rating of

"outstanding" in four of the five component job elements and a rating of "excellent," the next highest rating, in the fifth element. (Pl. Exh. 2; Tr. 84-85). In every respect, Ms. Bunnell's performance evaluation was superior to plaintiff's.

10. Four of the five candidates, one having withdrawn his candidacy, were all, on paper, "highly qualified." (Tr. 75.)

11. The four remaining candidates were each interviewed for the position by the hiring officials, William Brighton and Pat Casey. (Tr. 75, 278-79.) Mr. Casey found Ms. Bunnell to be the front runner at this point based in part on the engaging, energetic, likable personality that she presented during the interview and in non-work-related encounters around the office. Mr. Casey thought plaintiff had also interviewed well and was a good candidate. (Tr. 281-82.)

12. The recommending officials had not worked personally with the selectee, Julia Bunnell, or the plaintiff. (Tr. 79-80.) Mr. Brighton therefore instructed Mr. Casey to seek out opinions regarding Ms. Bunnell and the plaintiff from attorneys and paralegals that had recently worked with them. (Tr. 80, 282-84.) Similar information was not sought regarding the other two candidates in part because the recommending officials had personally worked with them and in part because the recommending and selecting officials had, at that time, narrowed the field of candidates down to Ms. Bunnell and plaintiff: one candidate, a white male, did not seem to be a promising candidate and the other, a white female, had just gotten a law degree and the recommending officials had encouraged her to pursue law practice and believed she would soon leave ENRD to do that. Id.

4

13. Everyone spoken to regarding Ms. Bunnell gave her high evaluations and thought she would make a tremendous supervisory paralegal. (Tr. 87.)  None of the people asked about plaintiff at that time recommended her for the position, and some criticized her work. (Tr. 282-88.)  Of plaintiff's then current colleagues, three testified at trial and all three, Meochi Timberlake, David Topel, and David Street, testified that they did not recommend plaintiff.

14. Meochi Timberlake was an African American Supervisory Paralegal with the ENRD. (Tr. 229.)  She knew the plaintiff, though she did not supervise her, and she knew Ms. Bunnell, the selectee. (Tr. 232-35.)  She had an unfavorable impression of plaintiff because plaintiff, in her view, would work at a slow pace and drag out assignments rather than work to get to the next project.  Plaintiff had, when asked by Ms. Timberlake, refused to step in to assist an attorney to whom she was not currently assigned.  On other occasions, plaintiff refused to travel.  On the other hand, she thought Ms. Bunnell was outstanding and a great paralegal who was knowledgeable and eager to take on whatever work needed doing.  When the selecting official, Mr. Casey, asked for Ms. Timberlake's opinions about plaintiff and the selectee, Ms. Timberlake recommended the selectee and not plaintiff.  (Tr. 235-38.)

15. David Topel, an ENRD attorney in the three-eight region group, had plaintiff assigned to him as one of two paralegals he could call on for assistance. (Tr. 196-97.)  Though one of his assigned paralegals, she did fewer than twenty hours of work for Mr. Topel over the course of a couple of years.  (Tr. 207.)  Mr. Topel thought plaintiff was not fit for a supervisory job because she was, in his view, unwilling to find ways to take on projects,

          she was unwilling to help overworked paralegals in her group when it was the practice of all the other paralegals to pitch in, and because he often observed her watching television in her office. (Tr. 197-99.)  He never requested that plaintiff be removed and cannot recall whether he did or did not complain to plaintiff's supervisor. (Tr. 207.)  He would sometimes complete paralegal work himself or find other paralegals to assist him. (Tr. 199.)  He did not know Ms. Bunnell, the selectee. (Tr. 203.)

16. David Street, another ENRD attorney in the three-eight group, had plaintiff as his paralegal for 13 years and was familiar with her work. (Tr. 209-10.)  The work for which he used plaintiff – for "cite checking, for helping to get together exhibits . . ., shephardizing, doing Westlaw searches – was work plaintiff could handle. (Tr. 216.)  When reviewing plaintiff's work, he generally found it to be "fully successful," though on one occasion he found it "excellent." (Tr. 226.)  Mr. Street did not recommend plaintiff when spoken to by the selecting official and he asserted that his decision was not based on race. (Tr. 216-17.)  He cited three specific incidents that led him to form a negative impression of plaintiff.  First, plaintiff had difficulty reading an exhibit list with common and technical  multi-syllable words.  Second, an attorney he worked with had, in what Mr. Street believed was a show of histrionics, exclaimed that plaintiff "is my paralegal and she is incompetent."  Third, another attorney had complained that on a particular case she had to create make-work for plaintiff. (Tr. 212-13.)

17. The listed references of plaintiff and Ms. Bunnell were not spoken with, because the recommending officials  were satisfied to hear from a sampling of each applicant's current or recent colleagues.   (Tr. 289.)

18. After learning that plaintiff's colleagues had a negative reaction to her possible promotion the recommending officials no longer believed that plaintiff was one of the top two candidates. They found that her less-engaging personality and lackluster work ethic suggested she would not make as good a supervisor as Ms. Bunnell. (Tr. 289.) In making recommendations to the ultimate selecting official, Bruce Gelber, they recommended Ms. Bunnell first and recommended Ms. Herz second, though they expressed their concern that she was likely to leave to begin a career as a lawyer. Ms. Bunnell was selected. (Tr. 89-90, 294-95.)

19. Though plaintiff was not selected, one of the recommending officials, Pat Casey, thought she had interviewed very well and had done well for herself in her present position. (Tr. 282.) Frances Jones, plaintiff's supervisor from 1996-1998, found plaintiff's work during that limited window to be pleasing and she recommended plaintiff for awards and suggested that she try for a supervisory position. (Tr. 117-18.)

20. The recommending officials and the colleagues providing comments concerning the applicants consistently testified that race was not a factor for them in filling the Supervisory Paralegal position. Their testimony is credible in light of the absence of evidence that any of these people acted out of racial bias or animus with respect to the selection process at issue.

21. Of all the witnesses at this trial, only the plaintiff and Frances Jones alleged racial discrimination at the ENRD. Their testimony was generic, not grounded in specifics, and not credible. Plaintiff contended that African American paralegals were given less instructions than Caucasian paralegals. (Tr. 72.) Her blanket assertion has no support in

the evidence. Ms. Jones expressed her belief that black and white paralegals were treated differently, particularly in the granting of awards. However, even her own testimony belies her claim: rather than pointing to an instance of disparate treatment, she points out her dislike of a policy under which people are owed awards instead of earning them. She testified that her

> understanding was that you reward based on performance and not on whether or not you like or dislike someone or they are ball players or team players per se, and at one point, I was told, "Okay, it's his time for an award," and I interjected again: "I have a problem there. It's his time for an award? I thought it was based on performance."

(Tr. 122.) Further, when asked about Meochi Timberlake, an African American promoted to Supervisory Paralegal, , Ms. Jones testified that both African Americans and Caucasian could be favored, so long as they "played the game" rather than being "fair and equitable." (Tr. 152.)

22. Despite plaintiff's contrary assertion, Kurt January, a union leader who oversees only a slice of union workers at the Department of Justice, neither alleges nor provides evidence of racial discrimination at ENRD.

23. At the time plaintiff applied for the Supervisory Paralegal position, two of the six ENRD Supervisory Paralegals were African-American (Tr. 61). Currently, 21% of all ENRD paralegals are African American; however, all six of the ENRD Supervisory Paralegals are now white. (Tr. 318, 323.)

24. The two African American Supervisory Paralegals were Meochi Timberlake and Frances Jones. Both have since left ENRD. Ms. Timberlake left ENRD to join the United States Marshals' Service where she took a job at a higher pay grade, grade GS-13. (Tr. 238.)

Ms. Jones left ENRD due to disagreements over management style with her subordinates and her boss, Robert Homiak, and due to her belief that language in her performance appraisal was unfairly critical. Ms. Jones' contention that she left in part over frustration with perceived racial animus is simply not believable in light of her failure to include such a complaint in the grievance she filed related to the events leading to her departure and in light of Mr. Homiak's credible testimony regarding his handling of complaints by both an African American and a Caucasian subordinate who each accused Ms. Jones of giving them lower-than-earned performance ratings. (Def. Exh. 9; Tr. 266.) Nothing about the departures of Ms. Jones or Ms. Timberlake indicates racism within the ENRD, and certainly not the kind of rampant racism that would lead the Court to conclude that an unrelated act, the selection of Ms. Bunnell, was influenced by race.

## CONCLUSIONS OF LAW

**A. General Propositions of Law**

1.  Plaintiff's complaint alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16. Plaintiff, an African American, alleges that the ENRD discriminated against her on the bases of her race.

2.  Claims of discrimination under Title VII are governed by the evidentiary scheme set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under that evidentiary scheme, the ultimate factual inquiry is whether the defendant intentionally discriminated against the plaintiff – that is, whether the defendant treated the plaintiff less favorably than others because of her race, gender or participation in protected activity. <u>United States</u>

9

        Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

3. The McDonnell Douglas scheme governs the allocation of burdens and the order of presentation of proof in a Title VII case alleging disparate treatment. 411 U.S. at 802, see also Burdine, 450 U.S. at 248. First, a plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; St. Mary's Honor Society v. Hicks, 509 U.S. 502, 506 (1993).

4. To establish a prima facie case of discrimination when a failure to promote is alleged, plaintiff must at least show that: (1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications she was rejected; and (4) either someone ... filled the position or the position remained vacant and the employer continued to seek applicants. Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).[1]

5. Once a plaintiff establishes a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 803. The employer's burden is not one of persuasion. To sustain this burden, the employer need only introduce evidence from which the trier of fact could rationally conclude that it was not motivated by discriminatory or retaliatory animus. Burdine, 450 U.S. at 257.

---

[1] The government would have the plaintiff show that the failure to promote gives rise to an inference of discrimination. This may be plaintiff's burden in some Title VII cases, see e.g., Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001); however, this is not the law in cases concerning a failure to promote.

6. The final phase of the Supreme Court's proof scheme involves plaintiff's opportunity to demonstrate that defendant's proffered reasons for denying her promotion were pretextual. The Supreme Court has been clear in stating that the plaintiff retains that "ultimate burden" of persuading the Court that she has been the "victim of intentional discrimination." Burdine, 450 U.S. at 256. Thus, the plaintiff must establish by a preponderance of evidence that the defendant's "proffered reason was not the true reason for the employment decision," and that plaintiff's membership in a protected class was the true reason for the employment action. McDonnell Douglas, 411 U.S. at 894; see also Hicks, 509 U.S. at 508; Aka v. Washington Hospital Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998). A plaintiff cannot establish that a proffered reason is pretext based merely on personal speculation of discriminatory intent. Carney v.Am. Univ., 151 F.3d 1090, 1094 (D.C. Cir. 1998).

7. Even if the appropriateness of the agency's actions was not clear, the issue to be decided by the Court is not whether defendant made the "right" decisions for its actions regarding plaintiff, but whether defendant's decisions were motivated by discrimination or reprisal. An employer may act for any reasons, good or bad, so long as the decision is not based on illegal discrimination. Burdine, 450 U.S. at 259.

8. Courts do not "second-guess" an employer in personnel decisions unless there is a demonstrably discriminatory motive. Fishbach v. District of Columbia Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996); Marshall v. Federal Express Corp., 130 F.2d 1095, 1100 (D.C. Cir. 1997); Mungin v. Katten, Muchin & Davis, 116 F.3d 1549, 15554 (D.C. Cir. 1997).

9.  Although the burden of production shifts between the plaintiff and the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated or retaliated against the plaintiff remains with the plaintiff throughout the entire case.  Burdine, 450 U.S. at 253, 255-56.

**B. Plaintiff's Discrimination Claim Involving her Non-Selection**

10.  In this case, with respect to plaintiff's claim that her non-selection for the position of Supervisory Paralegal was discriminatory, plaintiff has met her initial burden of stating a prima facie case.

    a.    Plaintiff, as an African American, is a member of a protected class.

    b.    Plaintiff applied for and was qualified for the Supervisory Paralegal position. Plaintiff submitted her application in August of 2000.  She possessed the knowledge, skills, and abilities associated with the job and was certified as meeting the job requirements by Human Resources personnel.  She was considered highly qualified on paper by the recommending official and the selecting official thought she had interviewed well, had done well for herself in her present position, and, along with the ultimate selectee, was one of the viable candidates.

    c.    Plaintiff was not selected for the promotion.

    d.    Another person, Ms. Bunnell, filled the position.

11.  The defendant has likewise met its burden and has articulated a non-discriminatory reason for choosing someone other than plaintiff.  The defendant has shown that the

selectee, Ms. Bunnell, had job performance appraisals superior to plaintiff, that while current coworkers had high praise for the selectee they could not recommend plaintiff, because plaintiff rarely took initiative and was not as trusted with complex tasks as her colleagues. Simply put, the defendant argues that the plaintiff was not promoted because she was a worse candidate than the selectee: less successful at her work and less respected and esteemed by her colleagues. A rational trier of fact could certainly conclude that no discriminatory animus figured into defendant's choice to promote Ms. Bunnell while not promoting plaintiff.

12. With the plaintiff and defendant each meeting their initial <u>McDonnell Douglas</u> burdens, the burden shifting framework now gives way and the remaining issue is simply whether the plaintiff, by a preponderance of the evidence, has demonstrated discriminatory intent. She has not.

13. The Court observes that the job performance appraisals do show plaintiff's inferior performance as compared to the selectee, and plaintiff has offered no evidence suggesting that the performance evaluations used during the promotion process were anything but legitimate and accurate, as plaintiff did not attempt to grieve her 1997-1998 performance appraisal.

14. The Court finds that the sentiments of coworkers favoring Ms. Bunnell and critical of the plaintiff are not based on race but rather are based on criteria relevant to the selection of a Supervising Paralegal. Each recommending official and colleague could articulate non-race-related reasons to deny plaintiff the contested promotion. In large part, they pointed to plaintiff's lack of initiative, motivation, and people skills and backed up those claims

with specific instances of conduct.  Though these are somewhat subjective criteria, they are relevant and arguably just as important as objective criteria, and they are permissible criteria given the total absence of evidence that they are a pretext for racial discrimination and the combined use of objective criteria such as the performance appraisals.  <u>Manning v. Chevron Chemical Co.</u>, 332 F.3d 874, 882 (5th Cir. 2003) (citing <u>Millbrook v. IBP, Inc.</u>, 280 F.3d 1169, 1176 (7th Cir.2002); <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1185 (11th Cir.2001)).

15. Additionally, one of the loudest of plaintiff's critics is herself an African American, Meochi Timberlake, and she unquestionably thought Ms. Bunnell was the right choice and that plaintiff should not be put in such a position of responsibility.  Ms. Timberlake's testimony further confirms for the Court that defendant's proffered reasons for its promotion decision were not pretextual.

16. On the flip side, plaintiff's attempt to sully the credibility of the recommending officials and plaintiff's colleagues, who deny race was a factor, completely fails.  The plaintiff would have this Court discount all these witnesses based on the testimony of Frances Jones and plaintiff that racial discrimination within ENRD is rampant.  The Court will not comply.  Jones's and plaintiff's testimony is full of conclusory statements and contradictions.  Plaintiff's accusation of disparate treatment has no life beyond her naked accusation and she offer no evidence showing an instance of disparate treatment based on race.  It seems Jones is concerned about management style – how awards should be given and how policies should be enforced – not about race.  If she is concerned about race discrimination, she has utterly failed to articulate the problem.

17. Additionally, plaintiff cannot show pretext in defendant's reasons because her application and that of the selectee were treated exactly the same. In both cases, the candidates were vetted by Human Resources, they were interviewed by the recommending officials, and their recent coworkers provided feedback instead of their listed references.

18. Plaintiff claims the selection process was "skewed" based on defendant's choice not to seek input from her stated references, her rating and reviewing official of record, and Nat Douglas, a black attorney for whom plaintiff worked. First, the recommending officials sought input from neither Ms. Bunnell's nor plaintiff's references. On this count, both candidates were treated the same. Second, Mr. Casey made an effort to speak with plaintiff's rating official, but that official, Mike Nee, was not in his office when Mr. Casey came by. Further, it is unclear from the evidence whether either recommending official ever sought out or spoke with rating or reviewing officials of the selectee. Third, the defendant's failure to speak with Nat Douglas, the ENRD attorney for whom plaintiff claims to have done most of her work, is not at all illuminating: plaintiff had not listed Mr. Douglas as a reference and there is no evidence that plaintiff requested that he be consulted. Further, conspicuously not testifying at this trial was Nat Douglas.

19. Plaintiff's argument that Mr. Brighton, the recommending official, had made up his mind to choose Ms. Bunnell before interviewing all the candidates is beyond the pale. The evidence shows that Mr. Brighton did not even know Ms. Bunnell prior to the selection process and that and he and Mr. Casey interviewed each of the four qualified candidates contending for the position. In any event, Mr. Brighton could have chosen any of the four candidates without interviews, so long as he did not make up his mind by considering

15

        race. Mitchell v. Baldridge, 759 F.2d 80, 85 n.3 (D.C.Cir.1985) (noting the issue is "whether the defendant's selection criteria--be they wise or foolish--are nondiscriminatory").

20. Finally, plaintiff's argument that her superior education and longer tenure at the ENRD made her the hands-down favorite for promotion is unconvincing. Plaintiff's arguably "better education . . . and longer tenure . . . do not establish that [s]he is clearly better qualified." Price v. Federal Exp. Corp., 283 F.3d 715, 823 (5th Cir. 2002). After all, both candidates had sufficient education and experience while the selectee, and not plaintiff, had a higher performance appraisal, the respect of her colleagues, and the motivation to go the extra mile in her work.

21. Therefore, the Court concludes that plaintiff has failed to meet her ultimate burden to show racial discrimination. A separate Order and Judgment consistent with these Findings of Fact and Conclusions of Law shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, June 22, 2005.